The United States Court of Appeals for the Fifth Circuit is now open according to law. God save the United States and this Honorable Court. Good morning. The first case for today is, and the only case for today, is 2019-50891, United States v. William Joseph Dubin et al. Mr. Gross, you may proceed with your argument. Good morning. May it please the Court. My name is Michael Gross. I represent the appellants, William Dubin and David Dubin, in this consolidated appeal from the Western District of Texas, San Antonio Division. With the Court's permission, I would like to orally argue this morning David Dubin's points of error one and three and rely upon my briefing for the remaining points of error. I've reserved five minutes for rebuttal. David Dubin point one, point of error point one, dealt with the aggravated identity theft case, where at sentencing, Judge Rodriguez said, to me, this does not seem to be an aggravated identity theft case. I hope I get reversed in the identity theft count. I think there's a very good likelihood that you're going to be acquitted, David Dubin, on count 25. And the reason for that is the case law we've cited in our brief makes it clear that David Dubin did not use Patient L's ID to facilitate the alleged fraud because the services were actually provided in this case, which is the distinction from the cases cited by the government in their briefing. And by that, I mean, as we know, Patient L, who was involved in counts 19 and 25, was tested by Louie Johnson, an LPA. And the testing was at the request of the facility where Patient L, also initials AS, was housed, the Hector Garza Residential Treatment Center. Because the center requested parts and David Dubin to do the testing of AS, Patient L, the services then were authorized to be billed under the Texas Medicaid Health Care Partnerships, the TMHP. And what did Mr. Johnson do on the testing? It's clear from Government's Exhibit 3018 that Mr. Johnson did the SASE. The SASE is the Substance Abuse Subtle Screening Inventory. Mr. Johnson also did the TSCC booklet, the Trauma Symptom Checklist. He also administered, Mr. Johnson administered to Patient L, the MACI, the Milan Adolescent Clinical Inventory. He also administered the Sign and Symptoms Anxiety, he administered the RAT, the Wide Range Achievement Test, and he administered the WASI, the Wechsler Abbreviated Scale of And what's important about the fact that Mr. Johnson administered those tests to Patient L at the request of the Hector facility is that there was clear testimony from Link Brothers at trial, pages 2774 to 2781 of the testimony. Link Brothers testified that a SASE takes 45 minutes approximately. The WASI takes approximately one hour, the RAT takes approximately one hour, the TSCC takes approximately 45 minutes, and that's 4.5 hours of testing. It's clear in this case that Louis Johnson did these tests, however, where things came up to a bind was whether or not when Mr. Johnson submitted his hours for billing to Parks and David Dubin, he said it was 2.5 hours. Well, this whole case deals with a conviction of David Dubin for one patient, Patient L, for three hours of billing that was billed for $540 and was paid for $338.10 by Medicaid. That's the whole issue on this case. And what defense had to encounter in preparing for this trial is that it was a modifier issue case, was the correct modifier being used. There were also issues that came up with respect to whether the 12-hour rule was violated. In other words, you can't do work more than 12 hours on a case for a patient under the Medicaid manual or the four-hour rule violated, whether or not you can spend more four hours testing on an individual or split. Mr. Gross, wasn't David Dubin also convicted of conspiracy to commit health care fraud? Yes, sir. Count 12. Exactly right, Judge Barsdale. And that's dealt... What would you call that for him? Point two or point what? I don't follow your ones and threes. But which point would you say that is? Are you going to argue that one? That's included a little bit in what I'm doing now. Points of error one and two were the sufficiency on both the aggravated ID theft and the conspiracy to commit health care fraud. Right. Okay. So they're both kind of involved here. However, given Judge Barsdale, given Judge Rodriguez's comments at sentencing on the fact that he thought that David Dubin would be acquitted of count 25, the ag ID theft case, I was focusing on that, on the sufficiency he talked about. Your argument. I just want to keep them straight. Yes, sir. Thanks so much. I'm confused. Why did the district court continue to allow that to happen if he thought that there was an evidence on it? Well, Judge Elrod, that's a great question. And here's what happened at sentencing. David Dubin, the appellant, made it clear to Judge Rodriguez at sentencing that the Medlock case from the Sixth Circuit applied because where services are actually rendered, then there's no use. There's no use to further facilitate the health care fraud because the services are actually rendered. Now, the government, Judge Elrod, at sentencing relied on the Kelly-Tarrillo case, which, by the way, the government has not cited at all in their brief in this case. And so, Judge Elrod, what Judge Rodriguez said was, look, I agree with that Sixth Circuit case, the Medlock case. And I would have ruled the way the Sixth Circuit did, but I'm in the Fifth Circuit. And so, I have to go by Fifth Circuit case law. What law, though, says to the contrary in the Fifth Circuit where someone has the authority to use the patient's identity that they can still be found for liable for the identity theft? What Fifth Circuit case holds that? To be frank, Your Honor, I've looked at it as well as I can. Government counsel may contradict me, but I think this is a case of first impression, Your Honor, for the Fifth Circuit. So there's nothing that bars us from following Medlock if we want to, in your opinion? That's exactly right, Judge Elrod. Exactly right. In fact, Your Honor, on that question, the government's case law that they cited in the brief, as an example, the Tull-Abreu case, it's a First Circuit case, and it favorably cites the Medlock case, Your Honor, from the Sixth Circuit. Was there health fraud in the Medlock case? In the Medlock case, Your Honor, the services were provided, but yes, they thought fraud occurred. However, because the services... I know that fraud was alleged, but is one way to understand Medlock, correct me if I'm wrong, but is one way to characterize Medlock that when you use personal identification information, but it turns out that you were allowed to use it, that you're not committing health care fraud, you're not using the ID for fraudulent purpose, that there is no ID theft? That is exactly right, Judge Hohn. The whole key is whether the services were provided, and if I could take... Do the fraud... I don't want to misspeak, so that's why I want to ask you this question. Is your theory that essentially the fraud theory and the ID theft theory are essentially co-extensive? Yes, sir. In other words... And they stand or fall together? Well, services were provided for patient L, Your Honor. I'm not asking a factual question. I'm just saying, just as a legal matter, your theory is that the fraud and the ID theft theories stand or fall together? The ID theft will fall by itself, regardless of the health care issue, Judge Hohn, only because in this unique case, the services were actually provided. And the reason for that, Judge Hohn, is the fraud allegation was that, hey, David Dubin billed for three hours for Medicaid instead of two and a half hours. However, the services were provided. And so even if you don't see sufficiently the evidence on health care fraud, you can still find insufficient evidence on the ag-ID theft, Your Honor. So it's the idea essentially that as long as you... It's sort of a mixed situation. You have authority to do X, but you don't have authority to do Y. There's fraud, but there's no ID theft under your theory. Exactly, Your Honor, especially when you did the services that were requested. And you billed as allowed under the Medicaid manual for those services. The question was, did you bill appropriately? And if I could, Judge Hohn, I've got a couple of sites from the Michael case that is cited favorably in the MonksGuard case cited by the government. And the Michael case is from the Sixth Circuit also. And so it was a great question, Judge Hohn, in the Michael case. They said, when then is lying about what one is entitled to covered by the statute and when not? And so in the Michael case, even though they might have thought that health care fraud existed, they said, look, in the Medlock case, the health care fraud was misrepresenting how and why the patients were transported. They were transported, but the misrepresentation was the how and the why. And so because of that, the Michael case said the defendants did not use patient names under the Ag-ID Theft statute because they really did transport those patients. And in the Michael case, Your Honor, the court went one step further in the distinction on when services were provided or not. And they said, you know, had Michael in the course of dispensing drugs to a patient under a doctor's prescription only inflated the amount of drugs he dispensed, then the means of identification and patient ID would not have facilitated the fraud, even though the fraud occurred. But they said that's not what he did in Michael. What he did was he used patient information to submit a fraudulent submission out of whole cloth. In other words, services weren't provided, making the misuse of these means by ID the predicate act of health care fraud. So, Judge Harrell, I think the Michael case is a great example, along with the Medlock case, of why you all could find, as Judge Rodriguez hopes you will, insufficient evidence on the Ag-ID Theft count and quit, but you could still go forward with the health care fraud and find sufficient evidence on there, even though I don't think there is. I hope that answers your question, Judge Mullen. Counsel, can you please tell us, as a practical matter, if we were to agree with you, and I am not foreshadowing, but if we were to agree with you about count 25, what all does that affect? Does that affect any of the other holdings of the court? It does not affect Judge Rodriguez's findings on the sufficiency of the evidence for the health care fraud. It does, however, have a huge effect on the sentencing, because as you know, Judge Elrod, it's a plus two for Ag-ID Theft. In other words, at sentencing, I watched Judge Rodriguez during sentencing, and he was very uncomfortable with the fact that he had to stack two years on the David Duden sentence because of the Ag-ID Theft. And I think that's what prompted Judge Rodriguez's statements at the punishment hearing. The biggest effect, Judge Elrod, is it will get rid of the plus two, the stacking of the two years on the sentence. But you're right, Judge Elrod, it will not have an effect by itself, standing alone on the health care fraud sufficiency. And so it would be a whole new, it would be re-sentencing from scratch, is that what you're saying? That's correct, Your Honor. You know, I think, well, I sat through the sentencing just so I could personally see it, Judge Elrod. And, you know, William Dubin, he got probation, five years probation. And I got the feeling Judge Rodriguez wanted to do probation, but he could not because of the plus two on the stacking for the Ag-ID Theft. So I think to be fair to David Dubin, Judge Elrod, this court, if they agreed that count 25 should be an acquittal, that the court should remand back to Judge Rodriguez for sentencing. What's the textual hook you're focused on? Is it the word use? Yes, Your Honor. Thanks for asking that, Judge Elrod. That's exactly right. I'm focusing on element one, knowingly use. So if you lend me your, hypothetically, if you lend me your car, but you make clear, I can only use your car to pick up my kids from school and instead I use it to go to the grocery store. Have I misused your car? You've received the services, but you may have misrepresented what the services were used for or how long you used the car, for instance, or something like that, Judge Elrod. However, you received the services, just like in the Medlock case, the patients were transported. Just like in our case, David Dubin, in part, did provide the SASE and the LACE and the MACE and the other testing. The services were provided. So in your example, Judge Ho, use is not what facilitated whatever fraud you may have done with the car, because you received the services of the car, Judge Ho. Mr. Gross, you saved time for rebuttal. Thank you. Thank you, Your Honor. Your Honor, Judge Elrod, can we just have clarification? You were going to also argue your point three, and that's the statute of limitations. That's correct, Judge, but with the questions on this one, I didn't get through it. All right. Thanks. Yes, sir. You may proceed with your argument. Thank you, Your Honor. May it please the Court. The aggravated identity theft count, count 25, involved using patient AS, that's the child's initials, it's designated as child L in the indictment, using his unique Medicaid information number and name in relation to health care fraud. And the background, it incorporates count 19, the background from count 19 involves services billed for patient AS in April of 2013. It was done by a licensed psychological associate, Louie Johnson, and Johnson was never a licensed psychologist in the state of Texas. And so Johnson conducted, the usual procedure is to conduct a clinical interview and then you do testing and then you do evaluation of the testing and then you produce a report of an evaluation. And in this case, he did not do the clinical interview and he reported he did two and a half hours of testing. The fraud here is not the hours, I beg to disagree with counsel. The fraud here is that the, that the hours that were charged were billed as being performed by a licensed psychologist when it was performed by a licensed psychological associate, which involves less compensation for that. Was the government's theory that the ID information was not used with legal authority at all or that it was used in two ways? One way was lawful, but another way was quite unlawful and that that's enough. Well, I don't have it right at my fingertips, but there's a footnote in our brief where they do not challenge the lawful authority element. The only element that they're challenging is the use element. So they put that that possible issue away. Is your point that their argument is forfeited? My point is that they're not making the argument about lawful authority. They conceded that it was not under lawful authority. And there's a site there in the footnote. OK, so I guess I'm saying, go ahead, I guess I'm saying is what what what counsel was saying that use the word use is the big issue in this case and in Musgard, the 11th Circuit case, it went into a very long analysis of what use means going into dictionary definitions. It means to employ something as a means of accomplishing or achieving something to avail oneself of to convert something to one service. And here, David Dubin used the means of identification by employing and availing himself of A.S.'s Medicaid number in order to obtain payment and thereby converted that name and number. He was evaluated, right? He was not evaluated, Judge. That's that's an important, very extremely important point. He was. I thought he was evaluated by the wrong person. No, he was the two and a half hours were spent and then the issue came up is, should I do the evaluation? And I'd like just to get it on the record because some of the sites were very difficult to find in the record. It's exhibits 2019, 2701, 2702 and and 3018. But but no evaluation was done. In fact, Louis Johnson said, I'm going back. I'm going back to the center to the center. Should I do an evaluation? And David Dubin sent an email, said, no, he's you know, he's going to be discharged or he has already been discharged. Do not. He specifically said, do not do an evaluation. So so there was no evaluation. It was just testing. And that's that brings me to my main point about Fedlock. So you're saying testing evaluation in your mind, as you're in the way you understand it is a write up of what the tests show. Is that what you're saying? Exactly. The test performed, but there was no analysis after the fact about the test. Exactly. Exactly. And the purpose of the test and there's testimony in the record. The purpose of the test is to help the center, the shelter where the child is at make recommendations and accommodate them. Once he's once the person has gone from the shelter, there's there's no there's no purpose for the evaluation. And well, so they couldn't have started out. They had his right to do the test on him. But because he was going to be leaving, they decided it was not worth the time and effort to do the the. Well, I skipped a step there because initially they said, don't do the test because they were under the impression that his hours had already been used up under the Medicaid guidelines. So they said, stop, basically, because we're not going to be able to bill for this. Don't do any evaluation. And then later it came to pass that because he was also because he was being discharged. How is that misusing his identity? If he's the one getting it's not a fake person getting the test or someone being substituted, it's the real person. It's just determinations about. Maybe, you know, to gin up fees inappropriately. I'm not blessing this in any way, but it's still the same right person. So it's not an identity theft. Well, Medlock, one of the key holdings of Medlock is that the misrepresentation didn't use the means of identification because the beneficiaries were actually transported. And I hear that it's different because the testing by itself had no value. So the services were not actually transported and further are actually provided and further Medlock emphasize that the ambulance providers didn't lie about who performed the work. But that's the lie here, that the work is being performed by a licensed psychologist, but it's not the identity theft is not between Johnson and the psychologist. It's between L and some unknown patient. An identity theft would be you substitute the person out or you're stealing his using him to treat other people. It's not who's performing the service that those people's identities are not being stolen. Well, they're being used to obtain a benefit from Medicaid that they would not be entitled to. No, but it's the Johnson versus the psychologist, the licensed person. I can't remember that person's name. Um. That was that there's no issue that there is an identity theft there. The only identity theft has to do with L, but L is what we're talking about the whole time. So it's not that there's an M and an N and an O who are other people who have stolen it and are getting some kind of benefit. Well, the important point of Medlock, Medlock said that they were actually transported, the beneficiaries, but they also said that if they had not been actually transported, we would find aggregated identity theft. So we have liberty to follow Medlock or is there some is there something that's a barrier to us adopting Medlock in this circuit? Well, my argument would be that it doesn't comport with the real meaning of the word use. But no, to answer your question, Mahmoud is a case within the circuit and that involves using a means of identification in re-sequencing diagnostic codes. And right. I'm familiar with Mahmoud, but Mahmoud is it contrary in any way to Medlock such that our precedent keeps us from following Medlock if we were so inclined? No, because because it did not focus on the use part, it did not focus on the word use. So we this is a do you agree with opposing counsel that this is a novel situation and we are we can look to other circuits to how to resolve it? Yes, Your Honor. So. My argument would be under plain meaning of the word use, he used the means of identification by employing and availing himself of the Medicaid number to obtain compensation and to convert that name to his service. Do you want to talk about the limitations point? Mr. Gross had introduced it, but didn't really talk about it. It's your option whether you want to talk about it or not. Sure, if Your Honors want me to talk about it, I'd be glad to. A superseding indictment is timely and relates back to the original indictment unless it broadens or substantially amends the original charge charges. The central policy of it is notice to allow defendant to be prepared to be called in to account for his activities. So in the first indictment, he's charged with seven counts of health care fraud and seven counts of aggravated identity theft. And the substitution of patient L for patient K involves the exact same crimes, the exact same method of billing for a licensed psychologist when it was not being billed by a licensed psychologist. The defense was notified of the change and said, well, the evidence is going to be your client's own emails and materials we've already provided to you in discovery. So the same facts was the basis for both indictments. There was no impermissible broadening or substantial amendment of the charges. Do you agree that if we were to reverse on count 25, and I'm not foreshadowing, just asking this so we know what the answer is, that we have to send back for re-sentencing as a whole on the whole? I don't think so, Your Honor, because it didn't impact the guidelines for fraud. It's just a plus two. It's his big, he got one year for the health care conspiracy, one year for count 19, and then stacked two years for the aggravated identity theft. So what would you say would happen then? Well, to be completely fair, it may have impacted his decision on what the sentence as to the other offenses. So it might have an effect on what he would, what he would sentence. He already sentenced to just concurrent sentences on those other two of just one year, but it could affect his sentence. So we would have to send it back for re-sentencing? I don't know whether you would have to send it back, but you could. OK. Mr. Stelmach, on the statute of limitations, superseding indictment issue, I just can't remember. Was any pretrial motion filed such as a motion to dismiss or anything? I don't believe you, I don't believe in your brief you raise that there's they can't pursue this issue because there wasn't some proper motion. No, they know they they argued they argued that matter. Your Honor. Yes. Before trial? Yes. Yes, Your Honor. So under rule, what, 12? I don't remember exactly, but everything was argued in this case. All right. Yes. Before trial, though. Yes, Your Honor. OK. That's all I have. OK, thank you, Mr. Stelmach. We have your argument. Mr. Gross, you save time for rebuttal. Would you like to say anything else? Please, Judge Elrod. Thank you very much. A few quick points on what counsel raised on count 25. It's clear that testing was done and billed under procedure code 96101 to Medicaid, which means psychological testing. So testing was done and billable under the manual. And it's not because there was no final evaluation before it was completed. It's because this testing was done and the testing was stopped after the testing was completed and before the final evaluation. And the Mahmoud case cited by the government, of course, that defendant never did test the patients in Mahmoud. With respect to point of error three for David Dubin, the statute of limitations, I think a fair reading of the government's brief is they concede the five-year statute was violated. They're just claiming that the superseding indictment did not substantially amend the charge. And, you know, at first blush, when you look at those counts, you know, patient K was in the original indictment, but was removed from the superseding indictment. And patient K had a service date of May 2013, a billing date of June 2013, five hundred dollars and forty dollars billed, and the tester was an LPA. Patient L was exactly at first blush like patient K. The service date was also May of 2013. The billing date was May of 2013. And just like patient K, five hundred and forty dollars was billed. So nobody thought that there was a substantial change in the superseding indictment because it looked just like patient K. But keep in mind, patient K was taken out of the superseding indictment and patient L put in front and said it wasn't a four-hour issue, it wasn't a 12-hour issue or a speed of time issue. And so counsel honestly thought it must be the modifier issue like all the other patients. It wasn't until the middle of trial that counsel discovered that, oh, my gosh, the government is not going on those issues, the modifier issue, the others. The government's going on a calendaring issue and a ramming up of numbers. How was that raised to the trial court? This is gross. I know you wanted a lawyer at trial. How was that raised? It was raised close to trial, your honor, on an IAC claim that counsel brought against himself. It was not a pre-trial because nobody knew that there was this significant substantial change to the superseding indictment. It looked like just patient L substituted for patient K. So I just wanted to clarify opposing counsel's statement. I just want to fall candor with the tribunal, Judge Barksdale. This was not raised pre-trial because nobody knew the significance of this change of substituting L for K. It was raised post-trial because, according to the argument, that's when it first came out to light, frankly, is when government counsel said, look, you know what, if you can find him guilty of aggravated identity theft, this is a calendar year issue. And Judge Barksdale, to be fair, though, to David Dubinster, this calendaring issue was very nebulous during trial. You know, there was testimony from Mr. Dubin, not a January to December issue, but an anniversary issue. And so this surprised everyone, Judge Barksdale, that, you know, come time for closing arguments by the government, the government said, look, where we got David Dubin is because he had a calendaring issue on the timing of the testing of patient L, because the testing was in April of 2013 and they claimed the billing was May of 2013 because of that calendaring issue. And so that's why I wanted to point out, Your Honor, that this was a substantial change and that it wasn't discovered to be a substantial change until well into the trial and during the closing argument by the government. So that's what I wanted to just point out to you all, Your Honor, and Judge Barksdale, I would clarify what you and your question about was it raised at the trial, I'd say. And that's all I had, Your Honor, I want to thank you so much for this opportunity to speak with you all. Thank you, we appreciate the arguments of both counsels, it's been helpful today and we appreciate your accommodating us with this novel format. We were able to hear and see you both, so thank you. At this time, your case is submitted and this session of the court will stand adjourned pursuant to the usual order. Thank you.